IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                                    |   |                                  |
|------------------------------------|---|----------------------------------|
|                                    | : |                                  |
| U.S. COMMODITY FUTURES             |   |                                  |
| TRADING COMMISSION                 | : |                                  |
|                                    |   |                                  |
| v.                                 | : | Civil Action No. DKC 2004-1021   |
|                                    | : |                                  |
| CALVARY CURRENCIES LLC, et al.     |   |                                  |
|                                    | : |                                  |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this commodities regulation case are: (1) Plaintiff's motion for partial summary judgment (paper 56) and (2) Defendants' cross-motion for summary judgment (paper 61). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the court grants Plaintiff's motion, in part, and denies Defendants' motion.

**I.   Background**

**A.   Factual Background**

The following facts are undisputed except where noted. Defendant Arthur John Keeffe II ("Keeffe") founded Defendant Calvary Currencies ("Calvary"), a limited liability investment company located in Rockville, Maryland, in January 2001. (Paper 56, app. at 3752). Calvary was involved in the business of trading foreign currency on the Foreign Exchange("FOREX") Market, and/or the interbank market. Keeffe was Calvary's sole member. Keeffe essentially ran the entire business, acting as managing partner,

president, and treasurer.   Keeffe was responsible for payroll, business development, compliance, maintenance of business files, human resources (e.g., hiring and firing employees), and customer accounts, among other things.   Calvary had a staff of approximately seven employees, including multiple individuals employed as "cold callers."   The cold callers' role was to solicit potential investment customers to pre-qualify them and to generate leads for Keeffe.   Calvary engaged in business only with "accredited investors," who Keeffe defined as individuals who had at least $100,000 in annual income and a net worth of a million dollars. (Paper 56, app. at 3817).

After a Calvary cold caller generated a customer lead, Keeffe, acting as an account opener, would send out a packet of information to the potential customer.[1]   Keeffe testified that he was the only person authorized to send correspondence to customers.   (Paper 56, app. at 3817).   The account opening packet included a cover letter, an account registration agreement, a risk disclosure statement, a power-of-attorney agreement, fund wiring instructions, and a "Frequently Asked Questions" ("FAQ") form.[2]   As part of the account

---

[1] Calvary employed another account opener, Michael Kochenash. Kochenash opened two accounts while working at Calvary.  Keeffe and Kochenash discussed the possibility of Kochenash partnering with Keeffe, but the two never reached agreement.   As a result, Kochenash left Calvary leaving Keeffe as the sole account opener. (Paper 56, app. at 3775, 3822).

[2] The FAQ form included a number of common questions and answers about speculation trading in currencies.  The form included
(continued...)

opening process, customers were asked to indicate their annual income and net worth, years of investment experience, and investment objectives. (Paper 56, app. at 1997). In addition, each customer was required to sign a standard client agreement, which contained multiple sections. Section I, titled "Account Trading in the Foreign Exchange Market," provided, among other things, that "the client shall place orders for the purchase and/or sale of spot foreign currency $100,000.00 transaction trades only with [Calvary]." (Paper 56, app. at 2000). It also stated that "[Calvary] or the clearing firm may at any time . . . decide to assume a trade where the Client has decided to close a position." *Id.* Section II of the agreement, pertaining to "Fund Deposits; Interest," directed the customer to pay to Calvary an initial deposit of $5,000 in order to open an account. Section II also stated that Calvary may require the customer to pay either Calvary or the clearing firm "additional sums by way of deposit." *Id.*

Section III of the agreement discussed "Fees, Commission and Expenses." It provided that:

> [f]or each transaction placed by the Customer in foreign currencies, [Calvary] will charge a fee of up to $50.00 per $100,000.00 transaction to open that position and up to $50.00 to close of that position. This $100.00 combined fee is charged regardless of gain or loss in any particular transaction.

---

[2](...continued)
the following question: "Can I take delivery?" to which it answered "Yes." (Paper 56, app. at 1684).

> Customer agrees and acknowledges that open and
> close price is determined by a bid-ask spread
> in each foreign currency that is set by the
> banking and/or brokerage institution(s)
> executing the trade(s).

*Id.* at 2001.  Section IV, titled "Client Acknowledgments," required customers to acknowledge that they read and understood the Risk Disclosure Statement and that Calvary "may execute transactions for Client's account(s) either as principal or broker."[3]

As noted, the account opening documents also included a "Risk Disclosure Statement."  The statement advised customers of the risks of trading foreign currency and that the investment is not suitable for all investors.  In addition, it provided:

> The clearing firm with which the Client's
> funds may be held on an omnibus basis may act
> as the counterparty to certain transactions
> for the Client's account and may sell foreign
> currencies to the Client from its own account
> or may buy foreign currencies from the Client
> for its own account.  In such case, the
> clearing firm may have a conflict of interest
> in attempting to secure the highest price it
> can from any such sale and the lowest possible
> price for any such purchase.  All sales and
> purchases for the Client's account, however,
> will be subject to competitive pricing by the
> clearing firm.

(Paper 56, app. at 2005).

---

[3] The Agreement contained additional sections as follows: Section V ("Conflicts of Interest");" Section VI ("Risk of Loss"); Section VII ("Event of Default"); Section VIII ("Tape Recording of Conversations"); Section IX ("Indemnity and Limitation of Liability"); Section X ("Authorized Agents"); Section XI ("Notices"); Section XII ("Assignment"); Section XIII ("General Clauses"); and Section XIV ("Applicable Law, Jurisdiction, and Venue").

Finally, customers were also required to sign a power-of-attorney form that authorized Keeffe to "buy, sell, and trade Foreign Currency Contracts . . . for the [customer's] account and risk and in the [customer's] name, or number on [Calvary's] books." (Paper 56, app. at 2007).  Calvary instructed interested customers to return the signed account documentation, along with a $5,000 deposit payable to Calvary.

Calvary placed foreign currency trades with a third party.[4] Throughout the period of Calvary's operations, it contracted with four different third parties, including EFX, IFX, GCI, and Gain Capital.[5]  With each of these third parties, Calvary opened a main account in its own name, which was divided into sub-accounts for each Calvary customer.   The customer accounts were separately numbered and were not held in the customers' names.   Keeffe executed trades with the third party on an omnibus (i.e., pooled) basis.   Customers who invested $5,000 received one "position," equivalent to $100,000.   Customers who invested more than $5,000 could be allotted additional positions, which provided greater flexibility to manage unexpected fluctuations in currency price. For example, the number of positions that a customer had could be

---

[4] Keeffe testified that the term "clearing house" used in the account opening documents refers to this third party.  (Paper 56, app. at 4187).

[5] Calvary's relationships with these third parties were sequential. Keeffe testified that Calvary only directed trades to one third party at a time.  (Paper 56, app. at 3805).

increased for a particular trade where there was a high likelihood of profit.  To the extent that the transaction was profitable, the customer would receive a greater proportion of the profits from the pooled transaction because of the additional position allotment. The profits could be used to help offset previous losses that the customer incurred.  (Paper 56, app. at 3868-73).

The opening position price for each trade was the market price at the time of the trade.[6]  (Paper 56, app. at 4215).  Generally, multiple trades were conducted during a particular day.  Although the FAQ form instructed customers that they *could* take delivery of foreign currency, Keeffe testified that customers were not advised

---

[6] There are two relevant prices, the "bid price" (the price at which an individual investor can sell) and the "ask price" (the price at which an individual investor can buy).  For an individual investor, the bid price is lower than the ask price.  In other words, an individual investor interested in purchasing currency must pay a higher price than the same investor would receive if he or she were selling the currency.  The bid-ask spread is the variance between the ask price and the bid price.  Parties who frequently buy and sell (i.e., market makers) profit from the spread because they can take advantage of those individual buyers willing to buy at the higher price, and those willing to sell to the market maker at the lower price.  Keeffe testified that it is "generally conceded" that the bid-ask spread with regard to currency is "five-wide" or has "five pips."  (Paper 56, app. at 3845-46).  For example, an individual investor can buy euro at $ .9730 dollar (the ask price) but can sell euro only at $ .9725. Here, the third parties could buy at the lower price but could sell at the higher price, pocketing the "five-wide" or "five-pip" difference for each trade.  Keeffe testified that Calvary negotiated with the third parties to take only some of the five "pips" thereby allowing Calvary to purchase at a discounted rate. Calvary would then make money by taking some or all of the remaining "pips" and increasing the cost to the customer.  *Id.* at 3841-48.

they had to take delivery, no customer requested delivery, and Calvary never anticipated taking delivery on behalf of its clients. Instead, the purpose of the trades was to speculate on the price fluctuations in foreign currency.   Therefore, to avoid delivery, Calvary would enter into offsetting transactions.  *Id*. at 3849-50. If a position remained open at the end of a trading day (i.e., 5:00 p.m. New York time), the third party automatically would sell the position and then repurchase the position for the next day's trading.[7]  Although this cycle of "roll-overs" (i.e., the process of closing and re-opening) could go on indefinitely, a particular position was not held open for more than twenty-four hours.  *Id*. at 3851-52.

Customers usually received monthly account statements from Calvary.[8]   In general, the account statement listed the trade dates, the type of currency traded, the opening and closing prices of each trade, and the account value at the end of the monthly

---

[7] Keeffe testified that the third parties that Calvary traded with required that all positions be closed within twenty-four hours.   *Id*. at 3850.    The CFTC attaches to its motion the declaration of Ezra Zask, an experienced futures trader, who states that this process of closing a position at the end of a business day and instantaneously reopening it do not constitute "settlement of a customer's account position."  (Paper 56, app. at 4356-57).

[8] Keeffe testified that at times Gain and GCI did not send timely monthly account statements making it difficult for Calvary to send its customer statements on a monthly basis. (Paper 56, app. at 3835).

period.[9]   In addition to these monthly statements, customers could
link to their numerical accounts at the third parties, through
Calvary's web site.[10]   (Paper 56, app. at 3964).   3806-10).

During the time period of Calvary's operation, it had
approximately twenty customers.   More than half of Calvary's
customers reported in the account opening documents that their net
worth was under $5 million, including:   Robert Bryant, John
Campbell, Robert Dinsmore,  Mark Elmore, Peter Greco, John Hawk,
Roger Holbrook, Richard Koenig, Michael Larson, Alfred Pulido,
Peter Singh, Fred Wickman, and Timothy Winters.   (Paper 56, app. at
1148, 1395, 1476, 1508, 1672, 1697, 1957, 1997, 2072, 2233, 2278,
2850, 3392).   Calvary ceased its operations in August 2002.   During
its period of operation, no Calvary customer earned net profits
from the investment.

B.  **Procedural Background**

On March 29, 2004, Plaintiff, the United States Commodity
Futures Trading Commission ("CFTC"), filed an action in this court

---

[9] It is difficult to determine which account statements were
actually sent to customers each month.   There are various different
forms of account statements that appear to be generated from
Calvary and are addressed to its customers.   (Paper 56, app. at
1179, 1423-25, 1600-01).

[10] There are some inconsistencies in Keeffe's testimony
regarding customers' internet account access.   Keeffe first
testified that customers could not link to their accounts at EFX
and did not think that they could link to their accounts at GCI
from Calvary's website.   (Paper 56, app. at 3809).   Keeffe
subsequently testified that customers had internet access at all
firms.   *Id*. at 3964.

alleging that Keeffe, himself and on behalf of Calvary, fraudulently solicited customers, inducing them into illegal off-exchange trading of foreign currency futures in violation of Sections 4(a) and 4(b)(a)(i) and (iii) of the Commodity Exchange Act, 7 U.S.C. §§ 6(a), 6(b)(a)(i), (iii) ("The Act") and related CFTC Regulations, 17 C.F.R. § 1.1(b)(1), (3). (Paper 1). The CFTC requests injunctive relief, restitution, civil monetary penalties, and other equitable relief such as this court might find appropriate.

On June 15, 2004, Keeffe, acting *pro se*, filed a motion to dismiss for failure to state a claim, asserting that the transactions forming the basis of the CFTC's complaint were not transactions for futures but were "spot" transactions, over which the CFTC has no regulatory authority. (Paper 8). On July 8, 2004, when Calvary still had not responded to the complaint, the CFTC applied for entry of a default against Calvary. The CFTC then moved for default judgment, permanent injunction, and ancillary relief against Calvary. On July 26, 2004, Calvary finally responded, moving to dismiss on the same grounds as Keeffe. The court issued an Order on October 15, 2004, denying The CFTC's motions for entry of default and default judgment against Calvary, and denying Defendants' motions to dismiss. (Paper 24). On November 19, 2004, Defendants filed a third-party complaint against IFX, Ltd., and Gain Capital Group. (Paper 27). The CFTC filed a

motion to strike the third-party complaint, which the court granted on February 2, 2005.

On November 18, 2005, the CFTC filed a partial motion for summary judgment as to Count II of the complaint, violation of § 4(a) of the Act, 7 U.S.C. § 6(a).  (Paper 56).  On January 17, 2006, Defendants filed an opposition memorandum and cross-motion for summary judgment.  (Papers 61 and 62).[11]

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba*

---

[11] Paper 62 is the memorandum in support of Defendants' opposition and cross-motion for summary judgment.

*Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The inquiry involved on a summary judgment motion "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson*, 477 U.S. at 252. Where the movant also bears the burden of proof on the claims at trial, as Plaintiff here, he "must do more than put the issue into genuine doubt; indeed, [he] must remove genuine doubt from the issue altogether." *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999) (internal quotation marks omitted), *cert. denied*, 530 U.S. 1204 (2000); *see also Proctor v. Prince George's Hosp. Ctr.*, 32 F.Supp.2d 820, 822 (D.Md. 1998) (evidentiary showing by movant "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party") (internal quotation marks and italics omitted).  Summary judgment will not be appropriate unless the movant's evidence supporting the motion "demonstrate[s] an absence of a genuine dispute as to every fact material to each element of the movant's claim and the non-movant's response fails to raise a genuine issue of material fact as to any one element." *McIntyre v. Robinson*, 126 F.Supp.2d 394, 400 (D.Md. 2000) (internal citations omitted).

When faced with cross-motions for summary judgment, as in this case, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). *See also havePower,*

*LLC v. Gen. Elec. Co.*, 256 F.Supp.2d 402, 406 (D.Md. 2003) (citing 10A Charles A. Wright and Arthur R. Miller, Federal Practice & Procedure § 2720 (3rd ed. 1983)).   The court reviews each motion under the familiar standard for summary judgment, *supra*.   The court must deny both motions if it finds there is a genuine issue of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment."   10A Federal Practice & Procedure §2720.

## III.  Analysis

The Act makes unlawful certain activities in connection with the sale of a "commodity for future delivery."   Section 4(a) of the Act, 7 U.S.C. § 6(a), requires, among other things, that futures contracts be sold on a "contract market" designated by the CFTC.

The CFTC alleges that Defendants marketed and sold foreign currency futures contracts to the general public and did not use a designated contracts market as required by the Act.   The CFTC asserts that there is no "legitimate" dispute to any material fact and that it is entitled to judgment as a matter of law as to Count II of the complaint, violation of Section 4(a) of the Act.[12]   In their opposition memorandum and cross-motion for summary judgment,

---

[12]   In Count I of the complaint, the CFTC alleges that Defendants defrauded their customers by misrepresenting the profit potential of trading foreign currency futures contracts, as well as failing to inform them of the associated risks and misrepresenting how those risks would be managed.   The CFTC does not move for summary judgment as to Count I.

Defendants contend that they engaged not in transactions for foreign currency futures, but in "spot" transactions over which the CFTC does not have regulatory authority, and that, even if the trade transactions were construed as futures trades, Calvary did not act as a counterparty in those trades.

In order for the CFTC to prevail, it must show as a matter of law, construing all facts in the light most favorable to Defendants, that: (1) it has jurisdiction over the transactions at issue, and (2) Defendants engaged in futures trading in violation of the Act.  Conversely, for Defendants to prevail on their cross-motion for summary judgment, they must show, construing all factual allegations in favor of the CFTC, that the CFTC did not have jurisdiction over the transactions at issue.[13]

## A.  CFTC Jurisdiction

Pursuant to Section 2(c)2(B) of the Act, the CFTC has jurisdiction over: foreign currency futures contracts that are offered or sold to parties who are not eligible contract participants, as defined in the Act, where the counterparty or person offering to be the counterparty to the non-eligible participant does not qualify as a regulated entity.  7 U.S.C. § 2(c)2(B).

---

[13] Defendants also could prevail if they established as a matter of law that, even though the CFTC had jurisdiction, the trading was not done in violation of the Act.  Defendants do not make this argument , perhaps conceding that the facts are in dispute as to this issue.

14

## 1. Regulated entity

Pursuant to the Act, regulated entities include: (1) financial institutions; (2) a broker or dealer registered under the Securities Exchange Act or a futures commission merchant registered under the Act; (3) an associated person of a broker or dealer registered under the Securities Exchange Act or an affiliated person of a futures commission merchant registered under the Act; (4) an insurance company or regulated subsidiary or affiliate of an insurance company; (5) a financial holding company; or (6) an investment bank holding company.   7 U.S.C. § 2(c)2(B)(ii). Defendants do not assert that Calvary qualifies as a "regulated entity."

## 2. Eligible contract participant

Section 1a(12) of the Act defines "eligible contract participant."  With regard to eligibility for individuals, the Act requires that an individual either (1) have assets of more than $10 million, or (2) have assets of more than $5 million and enter "into the agreement, contract, or transaction in order to manage the risk associated with an asset owed or liability incurred, or reasonably likely to be owned or incurred, by the individual."[14]  7 U.S.C. § 1a(12)(A)(xi).   There is undisputed evidence that eleven of

---

[14] "Eligible contract participants" also include entities, such as financial institutions, insurance companies, investment companies, employee benefit plans, and governmental entities, among others.  7 U.S.C. § 1a(12).

Defendants' customers were not "eligible contract participants" because they did not have the requisite assets.[15]   As noted, customers Robert Bryant, John Campbell, Robert Dinsmore,  Mark Elmore, John Hawk, Roger Holbrook, Richard Koenig, Michael Larson, Alfred Pulido, Peter Singh, and Timothy Winters, each reported on his Calvary account applications that his net worth was under $5 million.[16]

3.  **Counterparty to a futures transaction**

The next questions are whether the transactions at issue were futures trades and whether Calvary acted as a "counterparty" or offered to be a "counterparty" to the transactions.[17]   Defendants intertwine arguments regarding the nature of the actual trade transactions (i.e., that the trades were spot transactions) with those pertaining to the nature of the customer agreement and

---

[15] Defendants wrongfully assert that the statutory asset requirement, where there is risk management involved, is $1 to $5 million.

[16] Two other customers, Peter Greco and Fred Wickman, also reported assets below $5 million.  However, there is a factual dispute as to whether Mr. Greco was eligible based on his status as a financial representative (paper 56, app. at 1672, 3917) and whether Mr. Wickman applied as an individual or a trust, which would implicate different eligibility standards, *id*. at app. 2850. *See* 7 U.S.C. § 1a(12)(A)(v).  To the extent that these investors were "eligible" under the statute, the CFTC would not have jurisdiction over the transactions.

[17] The term "counterparty" is not separately defined in the Act.  By implication, a counterparty is the party engaging in or offering to engage in a foreign currency futures transaction with a non-eligible party.

Defendants' role in the trade (i.e., Calvary was not a counterparty to the trade).  The court therefore will discuss the arguments in tandem.  (Paper 62, Keeffe aff. at ¶ 5).

As the court stated in its earlier opinion:

> Differentiating a futures contract from a spot transaction is not always easy; the term "futures contact" is not defined in the Act, and there is no established list of the elements of a futures contract. *Noble Wealth,* 90 F.Supp.2d at 688 (citing *CFTC v. Co Petro Mktg. Group, Inc.,* 680 F.2d 573, 577, 581 (9th Cir. 1982)).  In *Noble Wealth,* the CFTC successfully claimed that defendants had violated the same provisions of the Act allegedly violated by Defendants in this case. The *Noble Wealth* court, citing cases that "have fleshed out [the] meaning" of the term "futures contracts," summarized its hallmark characteristics:
>
>> [A] "futures contract" has been defined as a contract for the purchase or sale of a commodity for delivery in the future at a price established at the time the contract is initiated. It may be fulfilled through offset, cancellation, cash settlement, or other means to avoid delivery, and is entered into primarily to hedge or speculate upon price changes in the commodity without transferring ownership of the commodity. Other characteristics that facilitate exchange-traded contracts include standardized commodity units and initial deposit and maintenance margin requirements.
>
> 90 F.Supp.2d at 688 (citations omitted).

With regard to spot transactions, the court explained:

> Spot Transactions, by contrast,

17

> are agreements for the purchase and
> sale of commodities that anticipate
> near-term delivery. . . . Spot
> transactions in foreign currencies
> call for settlement within two days.
> Spot contracts are excluded from
> regulation under the Act because
> Congress felt that "transactions in
> the commodity itself which
> anticipate actual delivery did not
> present the same opportunities for
> speculation, manipulation, and
> outright wagering that trading in
> futures and options presented."
> Congress, however, never intended to
> exclude from the Commission's
> jurisdiction transactions which are
> "sold merely for speculative
> purposes and which are not
> predicated upon the expectation that
> delivery of the actual commodity by
> the seller to the original
> contracting buyer will occur in the
> future."
>
> [*Noble Wealth,* 90 F.Supp.2d] at 688-89
> (citations omitted).

(Paper 23, at 6-7) (footnote omitted).

The CFTC and Defendants present two varying characterizations of the transactions that took place between Calvary and its customers. The CFTC asserts that the facts presented here mirror the definition of a futures transaction that was set forth in *Noble Wealth*. It argues that Defendants solicited customers to enter into contracts with Calvary for the purchase and sale of foreign currency, in standardized lot sizes. The CFTC asserts that the contracts: (1) had no provision for customers to make or take delivery; (2) could be held open indefinitely; (3) had prices that

18

were fixed at the time the contracts were formed through a pricing mechanism in the customer agreement (i.e., the bid-ask spread determined open and close prices); (4) were sold for speculative purposes; and (5) invariably were closed by offsetting transactions. (Paper 56, at 3). The CFTC maintains that customers were not told they had to take delivery of foreign currency, did not intend to take delivery, and, in fact, never actually took delivery of foreign currency. In addition, Calvary never maintained any bank accounts capable of receiving or delivering foreign currency in satisfaction of a spot transaction. Finally, the CFTC claims that the contracts at issue required customers to pay a predetermined portion of the total contract price as the "margin" payment, and required customers to make additional margin payments if their market position changed adversely.

Defendants dispute the nature of the transactions between Calvary and its customers. Although Defendants continue to assert that the underlying trades were spot transactions, their primary argument appears to be that, regardless of the nature of the currency trades, Calvary neither offered to be a counterparty to the trades nor acted as a counterparty to the trades. Therefore, pursuant to Section 2(c)2(B) of the Act, the transaction is not properly regulated by the CFTC.

Defendants maintain that Calvary's contracts with its customers were not for the purpose of buying and selling a

particular foreign currency but were strictly for the purpose of opening accounts.  After a customer opened an account and made an initial account opening deposit (usually $5,000), Calvary would then act as the client's agent and contract with third parties (e.g., Gain Capital, IFX) to trade in foreign currencies on the inter-bank spot market.  As noted, Defendants opened an account with the third party in Calvary's name, however, the account was segregated by separate numerical accounts, each corresponding with a Calvary customer.  The accounts were then traded on an omnibus basis.  Defendants assert that the third party, and not Calvary, acted as the counterparty to the trades.  (Paper 62, Keeffe aff. at ¶ 5).  To demonstrate that Calvary did not offer to be the counterparty to the trade, Mr. Keeffe testified in his deposition that customers were told that their funds were being traded with a third party and that Calvary would disclose the counterparty at the time it set up a new account.  Moreover, Mr. Keeffe stated that customers could link to their accounts at the third parties through Calvary's website.

Defendants further argue that the contracts with its customers did not specify the currency to be traded, or whether a particular currency was to be bought or sold.  Instead, the contract included a power-of-attorney provision that gave Calvary the authority to trade on behalf of the customer.  (Paper 56, app. at 1705).  In addition, the Risk Disclosure Statement in the contract specified

that a third party may hold a client's funds on an omnibus basis and may act as the counterparty to certain transactions for the clients' accounts. (Paper 56, app. at 1703). Moreover, Defendants maintain that Calvary's customer contracts did not establish a currency contract price at the time the customer agreement was initiated. Defendants argue that the subsequent contracts with the third parties (e.g., Gain Capital, IFX), which Calvary entered into on behalf of its customers, established whether a currency was to be bought or sold, and the price was set at the time of trading with the third party. Finally, Defendants assert that, with regard to the trading contracts, customer positions were not held open indefinitely but were closed each day by the third party.[18]

The undisputed evidence shows that, pursuant to *Noble Wealth*, the transactions at issue were futures trades, and not spot transactions. Defendants argue that the court should look only to the client agreement to determine whether the elements of a futures transaction are present. (Paper 62 at 7, 9). The court disagrees. The CFTC regulates "transactions." In order to determine the nature of a transaction, "it is often necessary to look beyond the written contract. . . . In order to gain the fullest understanding possible of the parties' agreement and their purpose, we often must consider the course of dealings between the parties and the

---

[18] This argument appears to relate to Defendants' contention that the trades were conducted on the spot market and were not futures transactions.

totality of the business relationship." *Commodity Futures Trading Comm'n v. Zelener*, 387 F.3d 624, 626 (7th Cir. 2004). *See also Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 319-20 (6th Cir. 1998); *Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 773 (9th Cir. 1995), *cert. denied by Schulze v. Commodity Futures Trading Comm'n*, 519 U.S. 815 (1996); *Commodity Futures Trading Comm'n v. IBS, Inc.*, 113 F.Supp.2d 830, 846 (W.D.N.C. 2000), *aff'd by Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187 (4th Cir. 2002); *Commodity Futures Trading Comm'n v. Midland Rare Coin Exch., Inc.*, 71 F.Supp.2d 1257, 1262 (S.D.Fla. 1999). It is appropriate, then, to look to both the client agreement and the subsequent currency trades to determine the nature of the transaction.

The transactions at issue involved the purchase and sale of foreign currency, for delivery in the future. The customers entered into the trades to speculate on currency price fluctuations. The price of the transaction was established at the time of the trade, based on the bid-ask spread set by the third party.[19] Both the opening and closing prices for each currency trade are reflected in the account statements Calvary sent to its customers. There was an initial deposit requirement of $5,000 and

---

[19] The account opening agreement described how the currency trade would be priced, noting that the "open and close price is determined by a bid-ask spread in each foreign currency that is set by the banking and/or brokerage institution(s) executing the trade(s)." (Paper 56, app. at 2001).

the client agreement specified that customers may be asked to provide "additional deposits," during the pendency of a trade. Moreover, Keeffe testified that "there were times that customers were called upon to put in additional sums of money" where the value of the underlying contracts fluctuated. (Paper 56, app. at 4173). There is no evidence of any provision for taking actual delivery of the currency, let alone delivery within two days as is required for a spot transaction, and no customer ever took delivery of the foreign currency. Instead, the trades were fulfilled by entering into subsequent offsetting transactions so that delivery was avoided. Although customer positions were technically "closed" each day, the third party automatically rolled over the position by reopening it for the next day's trading without the need for additional instruction from Defendants.

Collectively, these characteristics show that, regardless of the terminology that Defendants' used to describe the trades, the true nature of the transactions were futures trades. *See Noble Wealth*, 90 F.Supp.2d at 689 (noting that spot transactions were exempted from CFTC regulation, and stating "Congress, however, never intended to exclude from the [CFTC's] jurisdiction transactions which are sold merely for speculative purposes and which are not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future" (internal quotation marks omitted)).

Accordingly, the undisputed facts establish that the transactions at issue were futures transactions.

Notwithstanding this conclusion, neither side has shown that it is entitled to judgment as a matter of law because the analysis of the "counterparty" designation is far from clear.  The CFTC argues that Calvary is the counterparty to the trades but has not articulated how Calvary becomes the counterparty when there is no dispute that a third party (e.g., Gain, IFX, etc.) was directly involved in the transaction.  The CFTC ignores the reality that the currency trades involved a third party, yet relies on the nature of these trades to establish that the trades constituted futures, and not spot, transactions.

Likewise, even assuming that Defendants move for summary judgment on the counterparty issue, Defendants have not shown, as a matter of law, that Calvary could not be considered the counterparty to the trade with its customers.[20]  Calvary traded with the third parties in its own name and represented to at least some of the third parties that no one outside of Calvary had a financial interest in the account.  Moreover, Calvary did not simply pass-through the trade to its customers on the exact terms that it was

---

[20] Defendants state that they move for summary judgment "on the legal issue of standing," and reassert the arguments presented in their motions to dismiss, which argued only that the transactions at issue were spot and not futures transactions.  (Paper 61, at 1; Paper 62, at 3).  It does not appear that Defendants move for summary judgment on the counterparty issue.

given by the third party.  Instead, Calvary increased the cost to the customer in order to make a profit on the trade.

Although there may be some legal analysis that leads to the conclusion that Calvary was the counterparty or offered to be the counterparty, the CFTC has not provided such an analysis to the court.  For example, it may be that Calvary can be considered the agent of the third party or that, once it negotiated a position in its own name, it then reoffered it to the customer on new terms (i.e., a higher price), making Calvary, and not the third party, the counterparty to the transaction.  It is not for the court, in the first instance, to construct the framework for analysis.  *See Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985), *cert. denied*, 475 U.S. 1088 (1986) (stating that to "require the district courts to anticipate all arguments that clever counsel may present in some appellate future[,]" would "transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party").  *See also Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996), quoting *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986), *cert. denied*, 479 U.S. 1056 (1987) ("Given our adversary system of litigation, '[i]t is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.'").  Accordingly, a grant of summary judgment is unwarranted.

**B.  Futures trading in violation of the Act.**

The CFTC asserts that Defendants engaged in futures trading in violation of Section 4(a) of the Act, 7 U.S.C. § 6, because Calvary traded on a non-regulated board of trade.[21]   Moreover, the CFTC

---

[21] Section 4(a) of the Act, 7 U.S.C. § 6, provides that it is unlawful:

> to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States . . . for the purpose of soliciting or accepting any order for, or otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery (other than a contract which is made on or subject to the rules of a board of trade, exchange, or market located outside the United States . . .) unless –
>
> (1) such transaction is conducted on or subject to the rules of a board of trade which has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity;
>
> (2) such contract is executed or consummated by or through a contract market; and
>
> (3) such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery: *Provided*, that each contract market or derivatives transaction execution facility member shall keep such record for a period of three years from the date thereof, or for a longer period if the Commission shall so direct, which record shall at all times be open to the inspection of any representative of the Commission or the Department of
>
> (continued...)

26

maintains that it has previously opined that "'off-exchange trading of foreign currency futures or options with retail customers by counterparties that are not within one of the enumerated categories is a violation of Section 4(a) of the Act.'"[22]  (Paper 56, at 20; app. at 4389-90) (quoting the CFTC Advisory on Foreign Currency, Advisory 06-01 (Feb. 5, 2001)).  Because Calvary is not within one of the enumerated categories, the CFTC asserts that it is in violation of the Act.   Defendants represent that the currency trading occurred in the FOREX market and/or the interbank market. (Paper 56, app. at 4381-82, 4386-87).  Although Defendants do not seem to dispute that the trades were conducted on a non-regulated exchange, the resolution of this issue appears to turn, at least in part, on Calvary's role in the transaction (i.e., its status as a counterparty), which the court is unable to determine at this juncture.  Accordingly, the court will leave the issue of whether Calvary violated Section 4(a) of the Act, for future resolution.

**IV.   Conclusion**

Fed.R.Civ.P. 56(d) provides that:

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by

_____

[21](...continued)
    Justice.

[22] The phrase "enumerated categories" appears to reference the categories of regulated entities in 7 U.S.C. § 2(c)2(B)(ii), although this is not entirely clear.

27

> examining the pleadings and the evidence
> before it and by interrogating counsel, shall
> if practicable ascertain what material facts
> exist without substantial controversy and what
> material facts are actually and in good faith
> controverted.  It shall thereupon make an
> order specifying the facts that appear without
> substantial controversy, including the extent
> to which the amount of damages or other relief
> is not in controversy, and directing such
> further proceedings in the action as are just.
> Upon the trial of the action the facts so
> specified shall be deemed established, and the
> trial shall be conducted accordingly.

*Id.* As noted, the facts are undisputed with regard to several issues pertinent to the CFTC's jurisdiction, namely, the qualification of Calvary as a regulated entity and the eligibility status of some of Calvary's customers.  Although Defendants dispute that the transactions were futures trades, the controversy is not one grounded in fact but properly is characterized as one of law, and is ripe for resolution.  Accordingly, pursuant to Rule 56(d), the court will grant the CFTC's motion for partial summary judgment, in part, with regard to the qualification of Calvary as a regulated entity, the status of eleven of Calvary's customers, and the nature of the currency trades.  Defendants' cross-motion for summary judgment will be denied.  A separate Order will follow.

                            _____/s/_____
                            DEBORAH K. CHASANOW
                            United States District Judge